## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Brittany J. Buckley, | **Court File No. 18-cv-03124 (JNE/DTS)** |
| **Plaintiff,** | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| vs. | |
| Hennepin County, et al., | |
| **Defendants.** | |

---

### STATEMENT OF FACTS

The facts recited below were obtained from Plaintiff's Complaint, (Doc. No. 1), and Exhibits 1-8 which were attached to Plaintiff's Complaint, (Doc. No. 1-1). Plaintiff's complaint references and includes a detailed discussion of Plaintiff's "ambulance run report," (Compl. ¶16, 29, 37), but the ambulance run report was not originally included as an exhibit to Plaintiff's Complaint in an effort to preserve the confidentiality of Plaintiff's medical records. However, Plaintiff is now submitting the ambulance run record for the Court's review and consideration as Exhibit 1 to the accompanying Declaration of Zorislav R. Leyderman, (Leyderman Decl., Ex. 1).

**1. Ms. Buckley's Initial Contact with the Paramedics.**

On December 16, 2017, Plaintiff Brittany J. Buckley was in her apartment, sleeping on her sofa. Ms. Buckley was depressed about the two-year anniversary of her father's death and had been drinking alcohol. Ms. Buckley's friend became concerned for her safety and called 911 to request a welfare check. He met Minneapolis police

1

officers John Bennett and James Lynch at the door of Ms. Buckley's apartment complex and let them into the building and then inside Ms. Buckley's apartment. (Compl. ¶11.) The Officers spoke with Ms. Buckley and an ambulance was called. (Compl. ¶12.)

A short time later, Paramedics Anthony D'Agostino, Katherine A. Kaufmann, and Jonathan R. Thomalia arrived on the scene.  After a brief conversation, Mr. D'Agostino decided that Ms. Buckley needed to go to the hospital.  Ms. Buckley asked Mr. D'Agostino to leave her apartment.  Mr. D'Agostino replied that she was going to need to come with the ambulance crew to the hospital.  When Ms. Buckley verbally objected, Mr. D'Agostino stated that she was on a medical transportation hold and would have to come with them. (Compl. ¶13.)

## 2. The Defendant Paramedics Restrain Ms. Buckley in the Ambulance and Fabricate Allegations of Physical Violence and Aggression.

Ms. Buckley continued to verbally object while the officers and paramedics stood her on her feet, handcuffed her behind her back, and carried her out of the building and into the ambulance. Ms. Buckley never attempted to kick, strike, or bite anyone as she was being carried out to the ambulance. (Compl. ¶14.) Once in the ambulance, Ms. Buckley was laid face down, legs bent up with feet to her buttocks.  Although verbally complaining and crying, she showed no signs of physical resistance.  Ms. Buckley was then rolled onto her back, both arms cuffed to the gurney and strapped down by shoulder harness and hip, thigh, and ankle straps.  Ms. Buckley continued to show no signs of physical resistance or aggression and did not push against the restraints. (Compl. ¶15.)

Despite Ms. Buckley's lack of physical resistance or aggression, the ambulance run report falsely states, "Patient attempted kicking, biting and head butting responders while she was being removed from her house and taken to the ambulance."  The report further falsely states, "Patient continued to fight the restraints…" and then adds "it was elect[ed to] enroll her into the ketamine trials." (Compl. ¶16; Leyderman Decl., Ex. 1.)

**3.     Defendants Knew, Through Their Own Prior Ketamine Research, that Ketamine Routinely Causes Respiratory Failure and Subsequent Intubation.**

The "ketamine trials" was a study called "Ketamine versus Midazolam for Prehospital Agitation."  This study was the second of two Hennepin County studies attempting to validate the use of ketamine by ambulance crews to sedate patients whom paramedics deemed agitated.  In this study, agitation was defined as "a state of extreme emotional disturbance where patients become physically aggressive or violent, endangering themselves or those caring for them." (Compl. ¶17; Compl., Ex. 1.)

The prior study, *A Prospective Study of Ketamine versus Haloperidol for Severe Prehospital Agitation*, involved assessment of patients by paramedics against an Altered Mental Status Scale (AMSS), a measurement tool used internally by researchers at Hennepin Healthcare Systems, Inc., based on a combination of other scales used to measure alertness, sedation, agitation or intoxication.  As outlined in this study, this scale measures agitation as follows:

**Table 1.** The altered mental status scale.

| Score | Responsiveness | Speech | Facial Expression | Eyes |
|---|---|---|---|---|
| +4 | Combative, very violent, or out of control | Loud outbursts | Agitated | Normal |
| +3 | Very anxious, agitated, mild physical element of violence | Loud outbursts | Agitated | Normal |
| +2 | Anxious, agitated | Loud outbursts | Normal | Normal |
| +1 | Anxious, restless | Normal | Normal | Normal |
| 0 | Responds readily to name in normal tone | Normal | Normal | Clear, no ptosis |
| −1 | Lethargic response to name | Mild slowing or thickening | Mild relaxation | Glazed or mild ptosis (<half eye) |
| −2 | Responds only if name is called loudly | Slurring or prominent slowing | Marked relaxation (slacked jaw) | Glazed and marked ptosis (>half eye) |
| −3 | Responds only after mild prodding | Few recognizable words | Marked relaxation (slacked jaw) | Glazed and marked ptosis (>half eye) |
| −4 | Does not respond to mild prodding or shaking | Few recognizable words | Marked relaxation (slacked jaw) | Glazed and marked ptosis (>half eye) |

Although the purpose of this study was to examine ketamine as a treatment for severe agitation of +4 on the AMS scale, (Compl., Ex. 2, p. 1), those patients were excluded from the study and were all treated with ketamine. Instead, patients rated +2 or +3 on the AMS scale were injected with haloperidol during one six-month period of the study, and patients rated +2 or +3 on the AMS scale were injected with ketamine during another six-month period of the study. Alternative sedatives were removed from the ambulances and the drug administered to these patients was dictated solely by the time period during which they were enrolled into the study rather than any medical judgment on the part of caregivers. (Compl. ¶18; Compl, Ex. 2.)

The article, *A Prospective Study of Ketamine versus Haloperidol for Severe Prehospital Agitation*, (Compl., Ex. 2), reported the results of the study on patients rated +2 and +3 on the AMS scale. Defendants Dr. Cole, Dr. Nystrom, and Dr. Ho reported that 49% of patients receiving ketamine suffered complications as opposed to only 5% of patients receiving haloperidol, the long-time standard treatment for agitation. (Compl., Ex. 2, p. 559.) Complications in the ketamine group included hypersecretion/hypersalivation, emergence reaction (nightmares and hallucinations), vomiting, dystonia (abnormal muscle movements), laryngospasm, and akathisia (inner

restlessness and inability to remain still). Defendants further reported, "Intubation rate was also significantly higher in the ketamine group; 39% (25/64) of patients receiving ketamine were intubated vs. 4% (3/82) of patients receiving haloperidol . . . ." (Compl., Ex. 2, p. 559.) On April 21, 2016, Defendants published the following conclusion: "Ketamine is superior to haloperidol in terms of time to adequate sedation for severe prehospital . . . agitation, but it is associated with more complications and a higher intubation rate," (Compl., Ex. 2, p. 556). (Compl. ¶19.)

In a subsequent article on Defendants' ketamine versus haloperidol study, "*A Prospective Study of Ketamine as Primary Therapy for Prehospital Profound Agitation*," patients rated +4 were included in the reported data.  There, Defendants Dr. Cole, Dr. Nystrom, and Dr. Ho reported that endotracheal intubation rate for patients receiving ketamine was 57% (28/49 patients enrolled into the study were intubated).  (Compl. ¶21; Compl., Ex. 4, p. 789.)

 "Intubation," also known as "endotracheal intubation" is a serious medical procedure which involves placing a tube into the trachea (airway) in order to facilitate ventilation of patients experiencing difficulty breathing.  While it is vital to manage the airways of patients experiencing breathing difficulties and endotracheal intubation is considered the gold standard for airway management, endotracheal intubation is itself associated with a variety of minor to life-threatening complications.  These complications range from hoarseness and sore throat to trauma to mouth structures and larynx to spinal cord injury and other serious nerve damage.  (Compl. ¶20; Compl., Ex. 3.)

Ms. Buckley was enrolled into the second study conducted by Defendants that commenced on August 1, 2017, and was scheduled to be completed by August 31, 2018, but was suspended in July 2018 after widespread media exposure and resulting complaints by the community. As in the first study, subjects were enrolled without their knowledge or consent and the drug administered to these patients was dictated solely by the time period during which they were enrolled into the study. The study protocol precluded the use of other medications, including haloperidol, which the first study already demonstrated was far safer than ketamine. (Compl. ¶24; Compl., Ex. 1, p. 1-2.)

**4.    Defendants Knew of and Previously Acknowledged the Substantial Dangers and Health Risks Associated with Use of Ketamine.**

The issue of high rates of endotracheal intubation in patients receiving ketamine for prehospital agitation was well-known to Defendants before they began even their first study as this issue was being discussed and debated in journal articles published prior to the first study and Defendants participated in the discussions through their own journal articles. For example, a 2012 article authored by Defendants Dr. Cole, Dr. Heegaard, Dr. Nystrom, and Dr. Ho reported on two patients who were diagnosed with Excited Delirium Syndrome (ExDS) and treated with ketamine. In that article, Defendants published the following warning:

> We would caution against using ketamine sedation in situations that do not warrant the immediate need for interruption of the severe, life-threatening, metabolic acidosis/catecholamine surge seen in late-stage ExDS. Clinicians should always consider the risk-benefit ratio of a possible intervention. In 2012, Burnett et al. described a case report of laryngospasm as a complication of prehospital ketamine administration in an agitated person [reference removed]. Laryngospasm is a known potential side effect of ketamine and can cause airway compromise.

(Compl. ¶22; Compl., Ex. 5, p. 277.) In the same article, Defendants further reported as follows: "We would advocate that ketamine not be the chemical solution for every unruly or belligerent subject[], as this would lead to overuse with unnecessary risk." (Compl., Ex. 5, p. 277.)  In sharing their facility's protocol for prehospital agitation, Defendants stated, "Our EMS system standing-order protocol reserves the use of ketamine for profound agitation involving the imminent risk of injury to the patient or provider . . . ." (Compl., Ex. 5, p. 277.) Thus, Defendants knew of and personally acknowledged the risks associated with ketamine, specifically the complication involving "airway compromise," as far as five years prior to the December, 2017, incident involving Ms. Buckley. (Compl. ¶22.)

Researchers at other institutions shared similar concerns with high rates of endotracheal intubation after prehospital ketamine administration for agitation. *The Use of Prehospital Ketamine for Control of Agitation in a Metropolitan Firefighter-based EMS System,* (Compl, Ex. 6), was published on August 25, 2014, and reported a 23% endotracheal intubation rate for patients receiving ketamine. The first study of prehospital ketamine use on agitated patients by Defendants was commenced in October, 2014, after the above results were published and after Defendants Dr. Cole and Dr. Heegaard themselves acknowledged the high intubation rates associated with use of ketamine on agitated patients back in 2012.  Thus, Defendants knew, prior to commencement of the first study and especially prior to commencement of the second study involving Ms.

Buckley, that high rates of endotracheal intubation were a known, reported, and serious risk associated with use of ketamine as a sedative. (Compl. ¶23.)

**5.**  **Defendants Unlawfully Enrolled Human Subjects into Dangerous Ketamine Research Without Informed Consent.**

Both studies were approved by Defendant Hennepin Healthcare Research Institute, then known as Minneapolis Medical Research Institute, the internal IRB (Institutional Review Board) for Hennepin Healthcare Systems, Inc.  Despite the known risks of high endotracheal intubation rates and other complications with ketamine compared to the standard treatment with haloperidol, the IRB approved these studies as "Waiver of Consent Research" pursuant to 45 C.F.R. § 46.116(d). (Compl. ¶25.)

Department of Health and Human Services regulation 45 C.F.R. § 46.116 addresses requirements for informed consent of human subjects in medical research.  The law is stringent, stating "[e]xcept as provided elsewhere in this policy, no investigator may involve a human being as a subject in research covered by this policy unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative" and outlines specific information to be provided along with procedural safeguards to protect the rights and well-being of potential research subjects. (Compl. ¶26.)

There are narrow exceptions that allow an IRB to waive the requirement for researchers to obtain informed consent prior to including a human subject in a research study.  Defendant Hennepin Healthcare Research Institute waived the prior informed

consent requirement for both ketamine studies based on the Waiver of Consent provision

45 C.F.R. § 46.116 (d), which states as follows:

> (d) An IRB may approve a consent procedure which does not include, or which alters, some or all of the elements of informed consent set forth in this section, or waive the requirements to obtain informed consent provided the IRB finds and documents that:
>> (1) The research involves no more than minimal risk to the subjects;
>> (2) The waiver or alteration will not adversely affect the rights and welfare of the subjects;
>> (3) The research could not practicably be carried out without the waiver or alteration; and
>> (4) Whenever appropriate, the subjects will be provided with additional pertinent information after participation.

(Compl. ¶27.)

"Minimal risk," fur purposes of section 46.116(d), is defined as follows: "Minimum risk means that the probability and magnitude of harm or discomfort anticipated in the research are not greater in and of themselves than those ordinarily encountered in daily life or during the performance of routine physical or psychological examinations or tests." 45 C.F.R. § 46.102(i).  Sedation with ketamine coupled with endotracheal intubation is not a harm or discomfort ordinarily encountered in daily life or during the performance of routine physical or psychological examinations or tests.  The high risk of endotracheal intubation in the use of ketamine for treatment of agitation falls far outside the threshold for "minimal risk."  Further, the potential complications stemming from endotracheal intubation have the potential to affect the rights and welfare of study subjects.  Thus, Defendants knowingly violated 45 C.F.R. § 46.116 (d) when they waived consent for both ketamine studies. (Compl. ¶28.)

6.      **The Defendant Paramedics Inject Ms. Buckley with Ketamine Against her Will, Without Consent, and Without Justification.**

Through her encounter with Defendant Hennepin Healthcare System, Inc. and Defendant Paramedics Anthony D'Agostino, Katherine A. Kaufmann, and Jonathan R. Thomalia, Ms. Buckley was unwittingly enrolled into the second ketamine study, *Ketamine Versus Midazolam for Prehospital Agitation*, without consent.  Despite claims in the ambulance run record that Ms. Buckley was physically combative, she was scored by these same paramedics at the beginning of their care as +2 on the AMS scale at time mark 14:57:49.   The +2 score includes vocal outbursts but no physical resistance. (Compl. ¶29; Leyderman Decl., Ex. 1.)

In addition to the use of their internal Altered Mental Status Scale (AMSS), paramedics routinely use the Glasgow Coma Scale (GCS) to measure the level of consciousness of a patient.  It is comprised of a score of best eye response (1-4 points), best verbal response (1-5) points, and best motor response (points 1-6).  A GCS score of 15 indicates a fully awake and alert individual.  At time mark 14:57:49, when paramedics scored Ms. Buckley as +2 on the AMS scale, they also scored her as 15 on the GCS scale. (Compl. ¶30; Leyderman Decl., Ex. 1.)

As Defendant Paramedics Anthony D'Agostino, Katherine A. Kaufmann, and Jonathan R. Thomalia drew up medication in a syringe, Ms. Buckley saw that she was about to be injected with an unknown medication and verbally objected.  She told the Defendant Paramedics that she did not want whatever drug they were about to inject into her body.  She was verbally objecting but not physically resisting. (Compl. ¶31.)

10

At time mark 15:00:00, before Defendant Paramedics could inject her with ketamine, Ms. Buckley's AMSS score spontaneously dropped to -2 (responds only if name is called loudly, slurring or prominent slowing of speech, marked relaxation, and glazed or marked ptosis (eyelid drooping)).  Her GCS score also dropped to 7. (Compl. ¶32; Leyderman Decl., Ex. 1.)

Despite Ms. Buckley's only partially conscious state and AMSS score of -2, at time mark 15:00:17, she was injected with 150 mg of ketamine without consent and in direct disregard for her verbal requests not to be medicated.  She immediately developed complications including altered mental status, bradypnea (abnormally slow breathing), respiratory distress, and tachycardia (abnormally rapid heart rate). (Compl. ¶33; Leyderman Decl., Ex. 1.)

At time mark 15:02:00, Ms. Buckley's AMSS score was measured at -4 (unresponsive to physical stimuli) and GCS was measured at 3 (does not open eyes, makes no sounds, makes no movements).  Her respiratory distress continued to worsen and, by 15:08:00, paramedics were manually ventilating her with a bag-valve-mask device and her heart rate remained extremely rapid.  Ms. Buckley also experienced hypersalivation requiring suction and administration of atropine to remove the excess secretions that interfered with her breathing. (Compl. ¶34; Leyderman Decl., Ex. 1.)

Upon arrival at the Hennepin County Medical Center, one of Ms. Buckley's diagnoses was acute hypoxic (low oxygen) respiratory failure due to ketamine injection and she was intubated shortly after arrival.  She remained intubated until the next day. (Compl. ¶35.) Ms. Buckley awoke to find that someone had left a document in her room

11

entitled, "Consent for Clinical Investigation Conducted with Patients Notification of Enrollment." (Compl., Ex. 7.) It was only through this document that she learned she had been enrolled into the study *Ketamine versus Midazolam for Prehospital Agitation*. (Compl. ¶36.)

Body-worn camera recordings by Officers John Bennett and James Lynch and the ambulance run record created by Defendant Paramedics Anthony D'Agostino, Katherine A. Kaufmann, and Jonathan R. Thomalia show that Ms. Buckley engaged in verbal outbursts but was not physically aggressive or combative. Shortly after securing and physically restraining her inside the ambulance, Defendant Paramedics scored Ms. Buckley at -2 on the AMS scale. Thus, there was no need to sedate Ms. Buckley at all. Because Defendant Paramedics Anthony D'Agostino, Katherine A. Kaufmann, and Jonathan R. Thomalia had already determined that Ms. Buckley would be enrolled into the ketamine study, she was administered ketamine even as she drifted into unconsciousness. She then developed a well-known complication of ketamine administration—respiratory failure requiring endotracheal intubation, with its potential risks and dangers. (Compl. ¶37; Leyderman Decl., Ex. 1.)

**7.     Despite Their Knowledge of the Health Risks/Dangers Associated with Use of Ketamine, Defendants Designed and Implemented a Facility-Wide Policy (Protocol) Requiring the Use of Ketamine and Eliminating Safer Alternatives.**

In June of 2018, after a public outcry and in an attempt to restore the public's trust, Defendants Dr. Ho and Dr. Nystrom published an opinion article in the Minneapolis Star Tribune entitled, "Counterpoint: Discussion of ketamine use on suspects is incomplete." (Compl., Ex. 8.) In this article, Defendants stated that, "of the available sedatives in our

EMS system, ketamine is often the best **choice** based on the patient's behavior, the severity of agitation, the timing, the risk of a patient causing self-injury even after physical restraints have been applied and other medical considerations" (emphasis added). (Compl., Ex. 8.) Defendants' classification of ketamine as often being "the best choice" is peculiar as both studies, by design, deprived the paramedics of the ability to make a "choice" by removing all but one type of sedative from the ambulances. Defendants' sudden enthusiasm for routine use of ketamine is further contradicted by their own published research (already discussed in detail above), where Defendants explicitly cautioned against overuse of ketamine and advocated for its use only in exceptional situations involving patients suffering from Excited Delirium Syndrome (ExDS) who are engaged in active physical violence and aggression. (Compl. ¶38.)

Prior to August of 2017, Hennepin Healthcare paramedics did have a choice – they could choose an appropriate sedative, including ketamine, depending on the circumstances of each case. Although ketamine was available, its use was restricted to profoundly agitated patients with physical violence. In fact, as Defendants themselves reported, Hennepin County's "EMS system standing-order protocol reserve[d] the use of ketamine for profound agitation involving imminent risk of injury to patient or provider." (Compl., Ex. 5, p. 277.) Defendants themselves "caution[ed] against using ketamine sedation in situations that do not warrant the immediate need for interruption of the severe, life-threatening, metabolic acidisis/catecholamine crisis seen in late-stage ExDS." (Compl., Ex. 5, p. 277.) Defendants emphasized that "[c]linicians should always consider the risk-benefit ratio of a possible [ketamine] intervention" and further "advocate[d] that

13

ketamine not be the chemical solution for every unruly or belligerent subject[], as this would lead to overuse with unnecessary risk," (Compl., Ex. 5, p. 277). (Compl. ¶39.)

Prior to August 1, 2017, Defendants' standard operating procedure/protocol for treatment of severe agitation was to treat acute undifferentiated agitation with intramuscular haloperidol. But, in August of 2017, Defendants abandoned their own reported scientific conclusions and changed the sedation protocol in a way that eliminated choice and mandated sedation with ketamine for all agitated patients despite their level of agitation. Most strikingly, while Defendants previously prohibited use of ketamine unless the patient exhibited physical violence, the new protocol mandated use of ketamine on patients, such as Ms. Buckley, who exhibited loud verbal outbursts with no physical aggression. Furthermore, while Defendants previously advocated for use of risk-benefit analysis prior to administration of ketamine, Defendants' new protocol disposed even with this precaution, leaving ketamine as the only choice of sedative available to the paramedics. (Compl. ¶40.)

Defendants previously publicly acknowledged that using ketamine to sedate every patient who needed sedation "would lead to overuse with unnecessary risk." (Compl., Ex. 5, p. 277.) Yet, from August 1, 2017, to January 31, 2018, Defendants made a knowing and conscious decision to sedate every patient who needed sedation with ketamine and to deprive the paramedics of the opportunity to use risk-benefit analysis to choose an appropriate sedative given the circumstances. Defendants knew, from their own prior research, that approximately 49% of patients (about 5 out of 10) sedated with ketamine during this period would develop complications. Defendants further knew, from their

14

own prior research, that approximately 39% of patients (about 4 out of 10) sedated with ketamine during this period would develop respiratory distress and require intubation. (Compl. ¶41.)

Despite these known risks and availability of haloperidol, Defendants implemented a new sedation protocol from August 1, 2017, to January 31, 2018, which required Hennepin Healthcare paramedics to sedate all patients needing sedation with ketamine without the patients' consent. (Compl., Ex. 1, p. 2.) On December 16, 2017, as part of this new protocol, Defendants subjected Plaintiff to involuntary and nonconsensual sedation with ketamine which, predictably, resulted in complications, respiratory distress, and subsequent endotracheal intubation. (Compl. ¶42.) As a direct result of Defendants' actions, Plaintiff suffered involuntary and unnecessary sedation with ketamine, severe physical pain and discomfort, long-term chest pain and bruising, long-term throat pain, long-term voice changes and hoarseness, stress, fear, shame, humiliation, embarrassment, diminished self-esteem, diminished quality and enjoyment of life, and severe mental/emotional trauma, anguish, and distress. (Compl. ¶43.)

## **STANDARD OF REVIEW FOR DEFENDANTS' MOTION**

Defendants are seeking dismissal pursuant to Fed. R. Civ. P. 12(c), which states as follows: "Motion for Judgment on the Pleadings. After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard for reviewing a motion for judgment on the pleadings is the same standard that governs Rule 12(b)(6) motions. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir.

15

1990). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden*, 588 N.W.2d at 594. However, "[a]sking for plausible grounds . . . does not impose a probability requirement at the pleading stage." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Rather, it simply calls for sufficient facts to raise a reasonable expectation that discovery will reveal evidence of illegal conduct. *See id.*

A complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In determining whether a complaint meets this standard, the reviewing court must take the plaintiff's factual allegations as true. *Id.* at 1949-50; *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996). In addition, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594. Evaluation of a complaint on a Rule 12(b)(6) motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. "[D]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hafley*, 90 F.3d at 266 (internal quotations omitted). Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and

'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The court may, however, "consider some materials that are part of the public record or do not contradict the complaint as well as materials that are necessarily embraced by the pleadings." *Id.* (quotations and citation omitted); *see also Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) ("In addressing a motion to dismiss, the court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." (quotation omitted)). "[D]ocuments 'necessarily embraced by the complaint' are not matters outside the pleading." *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004). "[T]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted).

## <u>STANDARD OF REVIEW FOR QUALIFIED IMMUNITY</u>

Public officers are entitled to qualified immunity unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). To overcome the defendants' qualified immunity claims, the plaintiff must show that: (1) the

facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right; and, (2) the right was clearly established at the time of the deprivation. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010). This Court can exercise its sound discretion to determine which qualified immunity prong to address first. *Pearson*, 129 S. Ct. at 818. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotations omitted); *see also Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012).

The second prong of the qualified immunity analysis is whether the police officers' actions violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Baribeau*, 596 F.3d at 478. "The fundamental question under this analysis is whether the state of the law, as it existed at the time of the arrest, gave the defendants 'fair warning' that the arrest was unconstitutional." *Baribeau*, 596 F.3d at 478 (quoting *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007)). "For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Pelzer,* 536 U.S. at 739. "The Supreme Court . . . has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution." *Selk*, 508 F.3d at 875 (quoting *Pelzer*, 536 U.S. at 736).

**ARGUMENT**

I. **PLAINTIFF'S COMPLAINT (COUNT I) SUFFICIENTLY STATES A CLEARLY ESTABLISHED FOURTEENTH AMENDMENT EXCESSIVE FORCE CLAIM AGAINST PARAMEDICS D'AGOSTINO, KAUFMANN, AND THOMALIA IN THEIR INDIVIDUAL CAPACITIES.**

A. **Plaintiff's Excessive Force Claim Should be Analyzed Under the Objective Reasonableness Standard.**

The first step in analyzing Plaintiff's excessive force claim is to determine "the appropriate constitutional standard." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001). In *Andrews,* the issue was how to evaluate an excessive force claim brought by a patient involuntarily committed to a state hospital. The Eighth Circuit discussed, in detail, the distinction between various constitutional standards that may apply when a plaintiff alleges excessive use of force. *Id.* at 1060-62. The Court explained that prior jurisprudence had considered excessive force claims brought by "an arrestee, a pre-trial detainee, [and] a prisoner," but that an involuntarily committed patient did not fit neatly into any of these prior classifications. *Id.* at 1061. *Andrews* explicitly held that "[t]he Eight Amendment excessive-force standard provides too little protection to a person whom the state is not allowed to punish." Concluding that the plaintiff in *Andrews* was neither an arrestee nor a prisoner, *Andrews* held that excessive force claims brought by involuntarily committed patients "should be evaluated under the objective reasonableness standard usually applied to excessive-force claims brought by pretrial detainees."

In the present case, Ms. Buckley was also neither an arrestee nor a prisoner, and it's undisputed that, at the time she was injected with ketamine, she was on a medical transport hold and in the custody of the Defendant Paramedics. Pursuant to *Andrews*, Ms.

Buckley's excessive force claim should be analyzed under the Fourteenth Amendment pretrial-detainee objective reasonableness standard.

### B.   The Defendant Paramedics Used Excessive Force by Injecting Ms. Buckley with Ketamine.

To establish a Fourteenth Amendment excessive force violation, "a pretrial detainee must show only that the force purposely or knowingly used against h[er] was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017). Whether the force used was objectively unreasonable "turns on the facts and circumstances of each particular case." *Kingsley*, 135 S. Ct. at 2473. Relevant factors include the following:

> The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any efforts by the [defendant] to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the [defendant]; and whether the plaintiff was actively resisting.

*Id.*

In the present case, Ms. Buckley's complaint easily establishes an excessive force claim under the objective reasonableness standard. First, the facts show that Ms. Buckley never engaged in any physical aggression, violence, or resistance during her encounter with the Defendant Paramedics. (Compl. ¶14-15.) Second, the facts show that, prior to the administration of ketamine, Ms. Buckley was fully restrained on the gurney inside the ambulance: "Ms. Buckley was . . . rolled onto her back, both arms cuffed to the gurney and strapped down by shoulder harness and hip, thigh, and ankle straps. Ms. Buckley continued to show no signs of physical resistance or aggression and did not push against

the restraints." (Compl. ¶15.) Third, the Complaint and the ambulance run record establish that, prior to administration of ketamine, Ms. Buckley's Alerted Mental Status Scale (AMSS) score spontaneously dropped to -2. (Compl. ¶32-33; Leyderman Decl., Ex. 1.) An AMSS score of -2 includes the following symptoms: "Responds only if name is called loudly," "Slurring or prominent slowing," "Marked relaxation (slacked jaw)," and "Glazed and marked ptosis." (Compl. ¶18, 32.) Finally, Ms. Buckley's Glasgow Coma Scale (GCS) score, which measures consciousness on a 1-15 scale, was recorded as 7 prior to administration of ketamine, meaning that she was only semi-conscious after she was restrained inside the ambulance but before ketamine was injected. (Compl. ¶32; Leyderman Decl., Ex. 1.) It should also be noted that, according to the ambulance record, Ms. Buckley weighed 54.4 kg (120 pounds) at the time of the incident. (Leyderman Decl., Ex. 1.) Finally, the Complaint alleges that Defendants' injection of ketamine almost killed Ms. Buckley as she developed respiratory failure and required intubation to keep her alive.

As these facts demonstrate, the Defendant Paramedics chose to inject a powerful sedative into a petite, semi-conscious woman who was fully restrained on an ambulance gurney and exhibiting no physical aggression, violence, or resistance. Applying the factors set forth in *Kingsley*, the Defendant Paramedics' decision to inject Ms. Buckley with ketamine was objectively unreasonable and excessive. Ms. Buckley's right to remain free from excessive use of force was also clearly established in 2017. *See Kingsley*, 135 S. Ct. 2466. Thus, Ms. Buckley's Complaint (Count 1) sufficiently pleads an excessive force claim against the Defendant Paramedics.

II.   **PLAINTIFF'S COMPLAINT (COUNT II) SUFFICIENTLY STATES A CLEARLY ESTABLISHED FOURTEENTH AMENDMENT DUE PROCESS/BODILY INTEGRITY CLAIM AGAINST PARAMEDICS D'AGOSTINO, KAUFMANN, AND THOMALIA IN THEIR INDIVIDUAL CAPACITIES.**

"The integrity of the individual person is a cherished value of our society." *Schmerber v. California*, 384 U.S. 757, 772 (1966). "The protections of substantive due process have for the most part been accorded to matter relating to marriage, family, procreation, ***and the right to bodily integrity***." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (emphasis added). The Supreme Court has held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 278 (1990). "It is now settled law that the constitution places limits on the State's right to interfere with a person's most basic decisions about bodily integrity." *Rogers v. City of Little Rock*, 152 F.3d 790, 795 (8th Cir. 1998). "This right has been employed to protect against nonconsensual intrusion into one's body . . . and has been seen to permit the right of a competent person to refuse unwanted medical treatment." *Id.* The Supreme Court has held, for many years, that the "mere fact that [a person] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). In *Washington v. Glucksberg*, the Supreme Court confirmed "that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment." 521 U.S. 702, 720 (1997).

In *Washington v. Harper*, the Supreme Court established that prison inmates maintain a Fourteenth Amendment liberty interest in avoiding forced anti-psychotic medications: "[R]espondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." 494 U.S. 210, 221-22 (1990). The Court emphasized, "Respondent's interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229. The Court ultimately held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, ***if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest***." *Id.* at 227 (emphasis added).

In *Riggins v. Nevada*, the Court applied its *Harper* analysis to the issue of whether a pre-trial detainee may be forcibly injected with antipsychotic medication for the purpose of rendering him competent for trial. 504 U.S. 127 (1992). In *Riggins,* a pretrial detainee argued that the facility's forced administration of antipsychotic medication violated his constitutional rights. *Id.* The Supreme Court agreed and held that Riggins' Fourteenth Amendment rights had been violated because the Nevada court did not acknowledge that his Fourteenth Amendment liberty interest in freedom from unwanted medication, did not make any findings on the need for forced medication, and did not make findings on reasonable alternatives to antipsychotic medication. *See id.* at 136-37.

*Riggins* confirmed that the Fourteenth Amendment provides protection from "forcible injection of medication into a nonconsenting person's body" and that such injection "represents a substantial interference with that person's liberty." *Id.* at 134 (quoting *Harper*, 494 U.S. at 229). *Riggins* further confirmed that "due process allows a mentally ill inmate to be treated involuntarily . . . ***where there is a determination that the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest***." *Id.* at 135 (quoting *Harper*, 494 U.S. at 227) (quotations omitted) (emphasis added). *Riggins* concluded its overview of the law as follows: "Under *Harper*, forcing . . . drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to . . . [pretrial detainees]." *Id.*

The Court addressed the same issue once again more recently in *Sell v. United States*, 539 U.S. 166 (2003). In *Sell*, the Court confirmed that "an individual has a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Id.* at 178 (citing *Harper*, 494 U.S. at 221) (quotations omitted).  In that case, the Court concluded once again that individuals who are civilly committed can be medicated against their will but only if doing so is necessary and medically appropriate under the circumstances: "[T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill [person] . . . but only if the treatment is medically appropriate . . . and, taking account of less intrusive alternatives, is necessary significantly to further important governmental . . . interests." *Id.* at 179. *Sell* explained that, when the government wants to medicate a patient against

her will, the following question must be asked: "Has the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of . . . drug treatment, shown a need for the treatment sufficiently important to overcome the individual's protected interest in refusing it?" *Id.* at 183.

It should be noted that *Sell* originated from the Eighth Circuit, where it was determined that the Government can medicate a patient against his will for the sole purpose of rendering him competent to stand trial. *United States v. Sell*, 282 F.3d 560, 572 (8th Cir. 2002). The Supreme Court reversed this holding and determined the opposite – that medicating a *non-dangerous* patient against his will for the sole purpose of establishing competency to stand trial is unconstitutional. *Sell*, 539 U.S. at 183-86. Although the Supreme Court disagreed with the Eighth Circuit's legal conclusion, the general constitutional principles pertaining to the constitutionality of forcefully medicating patients against their will that were set out by the Eighth Circuit in *Sell* remain intact. Notably, the Eighth Circuit set forth the following constitutional standard in *Sell*:

> [W]e hold that the government must meet the following test in order for the government to forcibly medicate an individual. First, the government must present an essential state interest that outweighs the individual's interest in remaining free from medication. Second, the government must prove that there is no less intrusive way of fulfilling its essential interest. Third, the government must prove by clear and convincing evidence that the medication is medically appropriate. Medication is medically appropriate if: (1) it is likely to render the patient competent; (2) the likelihood and gravity of the side effects do not overwhelm its benefits; and (3) it is in the best medical interest of the patient.

*Id.* at 567.

In addition to cases involving unwanted medical treatment, the Fourteenth Amendment right to bodily integrity has also been applied in section 1983 cases involving nonconsensual medical experimentation. In those cases, courts have consistently held that subjecting individuals to life-threatening medical experiments without consent violates the clearly established Fourteenth Amendment due process right to bodily integrity.

For example, in *Heinrich v. Sweet*, 62 F. Supp. 2d 282, 290 (D. Mass. 1999), the court considered a case involving defendants who "conduct[ed] extensive, unproven and dangerous medical experiments on over 140 mentally ill patients, without their knowledge or consent." The court analyzed the claim as alleging a substantive due process deprivation of the right to bodily integrity. *Id.* at 312-13. The court's holding in *Heinrich* was clear and directly on point: "Failure to provide adequate disclosure of a potentially deadly medical experiment to subjects who were induced to participate on the basis of fraud constitutes a procedural irregularity sufficient to trigger the protections of [constitutional due process]." *Id.* at 313-14.

The defendants in *Heinrich*, like the Defendants here, argued that the plaintiffs' allegations were more akin to medical malpractice and did not rise to the level of a constitutional due process violation. *Id.* at 314. The *Heinrich* court correctly rejected this argument:

> [M]edical experimentation conducted under false pretenses by government actors can rise to the level of a constitutional violation. Thus, a determination that the Plaintiffs have alleged a violation of . . . [a] constitutionally protected right to be free from invasions of bodily integrity . . . [does not] result in constitutionalization of all state medical malpractice

> claims. The crucial elements of the constitutional violation are that (1) a . . .
> government . . . actor, (2) without obtaining informed consent and utilizing
> false pretenses to obtain participation, (3) conducted medical experiments
> known to have no therapeutic value and indeed known to be possibly
> harmful to the subjects. These elements are far more restrictive than the
> ordinary medical malpractice action for lack of informed consent . . . .

*Id.* at 314-15. Finally, the *Heinrich* court held that the right to bodily integrity was clearly established and denied qualified immunity, explaining that the right to bodily integrity generally and the right to be free from harmful, nonconsensual, and experimental medical treatment was clearly established as far back as 1946. *Id.* at 319-21.

In *In re Cincinnati Radiation Litigation*, 796 F. Supp. 796 (S.D. Ohio 1995), the court also considered whether subjecting human subjects to dangerous and non-consensual medical research violates the due process right to bodily integrity. In that case, the plaintiffs alleged that they were subjected to hazardous experimental radiation treatment without informed consent while they were being treated for cancer at the Cincinnati General Hospital from 1960 to 1972. *Id.* at 802-04. The defendants in that case sought qualified immunity, claiming that no constitutional violation had occurred and that the due process right not to be subjected to experimental medical treatment without consent was not clearly established at the time of the experiments. *Id.* at 810-22.

The court in *Cincinnati Radiation Litigation* rejected these arguments and denied qualified immunity, relying, in large part, on *Washington v. Harper*. *Id.* Specifically, the court held that the "right to be free of state-sponsored invasion of a person's bodily integrity is protected by the Fourteenth Amendment guarantee of due process." *Id.* at 811. "[T]he decision whether to participate in the Human Radiation Experiments was one that

each individual Plaintiff was entitled to make freely and with full knowledge of the purpose and attendant circumstances involved." *Id.* at 812. In determining that the plaintiffs had established a violation of the constitutional right to bodily integrity, the court highlighted that the plaintiffs "were never informed that the amount of radiation they were to receive would cause burns, vomiting, nausea, bone marrow failure, severe shortening of life expectancy, or even death." *Id.*

Finally, the court in *Cincinnati Radiation Litigation* determined that the right to be free from dangerous and non-consensual medical experimentation was clearly established in 1960:

> Even absent the abundant case law that has developed on this point since the passage of the Bill of Rights, the Court would not hesitate to declare that a reasonable government official must have known that by instigating and participating in the experimental administration of high doses of radiation on unwitting subjects, he would have been acting in violation of those rights. Simply put, the legal tradition f the country and the plain language of the Constitution must lead a reasonable person to the conclusion that government officials may not arbitrarily deprive unwitting citizens of their liberty and their lives.
>
> . . .
>
> Respect for an individual's right to bodily integrity is central to American constitutional history and tradition. The Constitution's Framers were heavily influenced by the enlightened views of popular sovereignty and limited government. . . .
>
> . . .
>
> And individual's autonomy was, thus, the primary value in revolutionary idealism that led to colonial independence. . . . Our entire history has been a continuous effort to safeguard that concept of ordered liberty. Respect for individual autonomy by the government is a central principle within that ideal.

. . .

> Like other constitutionally protected autonomy rights, the right to self-determination in matters of personal health is deeply rooted in our constitutional tradition. The right is an outgrowth of the "historic liberty interests in personal security and bodily integrity."

*Id.* at 815-16. "The doctrine of qualified immunity does not insulate the . . . Defendants from liability for their deliberate and calculated exposure of cancer patients to harmful medical experimentation without their informed consent. No judicially-crafted rule insulates from examination the state-sponsored involuntary and unknowing human experimentation alleged to have occurred in this case." *Id.* at 822.

In *Stadt v. University of Rochester*, 921 F. Supp. 1023 (W.D.N.Y. 1996), the court once again determined that injecting a foreign substance into a person's body as part of a medical experiment violates the due process right to bodily integrity. In *Stadt*, the plaintiff was injected with plutonium without consent during a medical experiment. *Id.* at 1025. The defendant sought dismissal, arguing that he was entitled to qualified immunity. *Id.* at 1027. The court denied qualified immunity and, in doing so, also recognized the distinction between the right to refuse medical treatment generally (which became clearly established in the 1990s) and the right to be free from non-consensual medical experimentation, which the court held had been clearly established since at least 1946:

> Defendant argues that at the time Stadt was injected with plutonium without her consent in 1946, there was no clearly established right to be free from medical experimentation, claiming that the right to refuse medical treatment has only recently been recognized as a "clearly established constitutional right."

> But this case does not involve the right to refuse medical treatment, but instead, the right to be free from non-consensual experimentation on one's

body — the right to bodily integrity — a right which has been recognized throughout this nation's history. . . . I find that under the plain language of the Fifth Amendment to the Constitution, the plaintiff had a clearly established right in 1946 to be free from being injected with plutonium by the government without her consent. The defendant, therefore, is not entitled to the defense of qualified immunity.

*Id.*

Finally, in *Bounds v. Hanneman*, No. 13-cv-266 (JRT/FLN), 2014 WL 1303715 (D. Minn. March 31, 2014), this Court recently held that government officials who subjected human subjects to scientific research without informed consent violated the constitutional right to bodily integrity and were not entitled to qualified immunity. In *Bounds*, the plaintiffs alleged that defendant police officers engaged in unethical clinical research when they offered marijuana to vulnerable human subjects for the purpose of observing their behavior while under the influence. *Id.* at *2-3. The defendants in *Bounds* sought dismissal based on qualified immunity, which this Court denied. *Id.* at *8-12.

This Court started its analysis with the general recognition that the Constitution protects the right to bodily integrity: "The Supreme Court has recognized a substantive due process right to bodily integrity." *Id.* at *8 (quotation marks omitted). Jude Tunheim concluded that the plaintiffs in *Bounds* had sufficiently established a violation of the right to bodily integrity based on the following factors: (1) that the plaintiffs were subjected to experimental research without consent; (2) that the plaintiffs did not participate voluntarily; and (3) that the defendants forced plaintiffs to ingest large and dangerous amounts of a controlled substance without any therapeutic purpose. *Id.* at *9. In reaching his conclusion, Judge Tunheim relied heavily on *Cincinnati Radiation Litigation*, which

is discussed in detail above. *Id.* Judge Tunheim concluded his analysis with a determination that the defendants in *Bounds* were not entitled to qualified immunity. *Id.* at \*12. Although Judge Tunheim focused on marijuana being an illicit drug, he also emphasized that prior precedent on the constitutional right to bodily integrity was an independent basis to deny qualified immunity: "This is not to say that the case law on bodily integrity due process rights did not clearly establish that Defendants' conduct would be a constitutional violation." *Id.*

The caselaw cited above clearly established the following legal principles as of December of 2017 (the date of Ms. Buckley's forced sedation):

1. The Fourteenth Amendment right to substantive due process includes the right to bodily integrity which, in turn, includes the right to refuse unwanted and unnecessary medical treatment;

2. The constitutional right to bodily integrity includes the right to be free from being subjected to dangerous experimental medical studies without informed consent; and

3. Individuals who are in state custody (such as prisoners, pretrial detainees, and civilly committed individuals) can be medicated against their will only if the individual is dangerous to herself or others and the treatment is in the individual's medical interest.

Turning to the case at hand, Ms. Buckley's Complaint sufficiently establishes that she was forcefully injected with ketamine, a knowingly dangerous sedative, against her will and while she was already only semi-conscious, fully restrained inside the

31

ambulance, and offering no physical aggression or resistance. The Complaint furthermore sufficiently alleges that Ms. Buckley was sedated with ketamine as part of an experimental study into which she was entered without informed consent and without being given the opportunity to assess the well-known and serious health risks associated with ketamine, including the known and substantial risk of respiratory failure and possibility of death. The Defendants violated Ms. Buckley's clearly established right to bodily integrity when they injected her with ketamine as part of a dangerous medical experiment performed without informed consent and after she specifically requested not to be medicated. The Defendants also violated Ms. Buckley's clearly established constitutional right to bodily integrity when they injected her with a powerful sedative against her will while she was being detained in their custody and unable to leave and while Defendants knew that Ms. Buckley was not presenting a danger to herself or others. For all of the foregoing reasons, Ms. Buckley's Complaint (Count 2) sufficiently establishes that Defendants violated her clearly established Fourteenth Amendment right to bodily integrity.

## III. PLAINTIFF'S COMPLAINT (COUNT II) SUFFICIENTLY STATES A CLEARLY ESTABLISHED DELIBERATE INDIFFERENCE CLAIM AGAINST PARAMEDICS D'AGOSTINO, KAUFMANN, AND THOMALIA IN THEIR INDIVIDUAL CAPACITIES.

"Although an involuntarily committed patient . . . is not a prisoner per se, h[er] confinement is subject to the same safety and security concerns as that of a prisoner." *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004). Thus, although deliberate indifference claims proceed under the Fourteenth Amendment when alleged by a civilly

32

committed plaintiff, the Eighth Amendment deliberate indifference standard of review applies. *Id.*; *Senty-Haugen v. Goodno*, 462 F.3d 876, 889 (8th Cir. 2006); *Lee v. Klingaman*, No. 13-cv-799 (PJS/FLN), 2013 WL 1900564, at *3 (D. Minn. Apr. 18, 2013 (Noel, Mag. J.) *report and recommendation adopted by* 2013 WL 1900561 (May 7, 2013).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. The U.S. Supreme Court has clearly held that the Eighth Amendment prohibits "unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). *Schaub v. Vanwald*, 638 F.3d 905, 910 (8th Cir. 2011). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31 (1993). A prison inmate challenging conditions of confinement and/or medical care under the Eighth Amendment must prove that the defendants acted with "deliberate indifference." *Nelson v. Corr. Med. Serv.*, 583 F.3d 522, 528 (8th Cir. 2009). "A prison official is deliberately indifferent if he knows of and disregards a serious medical need or substantial risk to an inmate's health or safety." *Id.* (internal quotations omitted).

Deliberate indifference is equivalent to criminal-law recklessness, which is "more blameworthy than negligence," yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. *See Farmer v. Brennan*, 511 U.S. 825, 835, 839-40 (1994). An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir. 2007). Deliberate indifference

must be measured by the official's knowledge at the time in question, not by "hindsight's perfect vision." *Id.* at 993 n.1 (quoting *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir. 1998)).

"The Supreme Court has interpreted the Eighth Amendment's prohibition against cruel and unusual punishment to include a right to safe and humane conditions of confinement." *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008) (citing *Farmer*, 511 U.S. at 847). "A denial of safe and humane conditions can result from an officer's deliberate indifference to a prisoner's safety." *Id.* "A claim based on deliberate indifference requires a substantial risk of harm to the inmate that an officer knew of and disregarded." *Id.* "A prison official's deliberate indifference to substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. Public officials can be held liable under the Eighth Amendment if they "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

In *Nelson v. Correctional Medical Services*, a female inmate sued a prison guard for shackling her while she was in labor. 583 F. 3d at 525-26. The Eighth Circuit determined that, by shackling the plaintiff while in labor, the defendant subjected the plaintiff to a substantial risk of serious harm, thereby violating the Eighth Amendment. *Id.* at 529. *Nelson* considered, and ultimately determined, that forcing a woman to labor while shackled is "inherently dangerous" and poses a "substantial risk of serious harm." *Id*. *Nelson* emphasized that deliberate indifference could be inferred from the defendant guard's admissions that shackling a pregnant woman is inappropriate and poses a risk of serious harm. *Id. Nelson* also emphasized that the defendant guard in that case knew that

the plaintiff was on good behavior, never exhibited any signs of aggression or violence, and was not a flight risk, all of which also supported the Court's finding of deliberate indifference. 583 F.3d at 530-31. Finally, the Eighth Circuit in *Nelson* explained that the shackling in that case violated the Constitution because it caused "unnecessary suffering at a time when . . . [the plaintiff] would have likely been physically unable to flee because of the pain she was in . . . ." *Id.* at 530.

All of the factors considered by the Eighth Circuit in *Nelson* are applicable in the present case. First, as in *Nelson*, the Defendants here knowingly subjected Ms. Buckley to respiratory failure, which is undeniably a substantial risk of serious harm. Defendants knew, from their own reported research, that approximately 40-50% of individuals injected with ketamine during pre-hospital transport would develop significant and life-threatening complications. Just like the shackling in *Nelson*, the Defendants here knew and had previously admitted that injecting Ms. Buckley with ketamine was inherently dangerous. As explained in the Complaint, Defendants knew of and personally acknowledged the risks associated with ketamine, specifically the complication involving "airway compromise," as far as five years prior to the December, 2017, and advised against the use of ketamine with the exception of extreme cases involving life-threatening situations and physically combative patients. (Compl. ¶22; Compl., Ex. 5, p. 277.) Finally, just like the plaintiff in *Nelson*, Ms. Buckley was also physically compliant, unable to flee (due to being physically restrained to the gurney), and not exhibiting any signs of physical aggression or resistance. As the defendant in *Nelson*, the Defendants here knowingly and deliberately subjected Ms. Buckley to a substantial risk of serious

harm without justification and in violation of the constitutional prohibition against cruel and unusual punishment.

Having determined that the plaintiff in *Nelson* had established a constitutional violation, the Court went on and determined that the defendant was not entitled to qualified immunity. *Id* at 531-34. The Court explained that the plaintiff's right to be free from being subjected to "substantial risk of physical harm . . . [and] unnecessary pain" was clearly established in 2003 when the *Nelson* incident occurred. *Id.* at 532. Although Ms. Buckley is suing the Defendants for unnecessarily injecting her with ketamine (as opposed to unnecessarily restraining her with physical restraints), the underlying issue is the same – Ms. Buckley is alleging that the Defendants unnecessarily restrained her through use of ketamine, thereby subjecting her to a substantial risk of developing respiratory failure and unnecessary pain and suffering. Pursuant to *Nelson*, Ms. Buckley's right not to be subjected to substantial risks to her health and safety while in the government's custody was clearly established in December of 2017. *See id.*

Contrary to Defendants' arguments, the Defendants' duty not to subject detainees to substantial risks to their health and safety has been applied by the courts in a variety of contexts. For example, the Eighth Circuit has held that knowingly subjecting inmates to work conditions that present a substantial risk to the inmates' health or safety constitutes deliberate indifference. *See Fruit v. Norris*, 905 F.2d 1147, 1150 (8th Cir. 1990) ("It is well established that when prison officials intentionally place prisoners in dangerous surroundings . . . or when they are deliberately indifferent either to prisoners' health or safety, they violate the eighth amendment to the Constitution.") (quotations and

alterations omitted). Courts have likewise held that deliberate indifference to the risk of suicide constitutes a clearly established constitutional violation. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012).

The deliberate indifference standard has also been applied in failure to protect cases where a detainee alleges a constitutional violation arising from unsafe or dangerous conditions of confinement. *See Jensen v. Clarke*, 94 F.3d 1191, 1197 (8th Cir. 1996). In that context, the Eighth Circuit has again focused on whether the plaintiff was being confined "'under conditions posing a substantial risk of serious harm.'" *Id.* (quoting *Farmer*, 511 U.S. at 834); *see also Young v. Selk*, 508 F.3d 868, 871-73 (8th Cir. 2007). In another related context, the Eighth Circuit has held that labeling an inmate a "snitch" constitutes an Eighth Amendment violation because it exposes the labeled inmate to "substantial risk of serious harm." *Irving v. Dormire*, 519 F.3d 441, 450-51 (8th Cir. 2008).

The underlying theme in all these cases is precisely what was identified by the Eighth Circuit in *Nelson*, 583 F. 3d at 531-34. Under *Farmer v. Brennan*, government officials have a clearly established constitutional duty not to subject detainees to dangerous "conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. This constitutional duty applies to cases where the government official fails to protect a detainee from existing risks/dangerous conditions (such as cases involving failure to protect from substantial risk of inmate assault and failure to protect from substantial risk of suicide). The same constitutional duty also applies to cases where government officials create or subject the detainee to conditions posing substantial risk of

serious harm (such as cases involving shackling during medical procedures, forcing detainees to work in a dangerous environment, or labeling the detainee a snitch). Thus, although there may not be a case with identical facts where paramedics unjustifiably sedated a fully restrained and compliant patient, the law is clear that individuals who are civilly committed or confined have a constitutional right not to be subjected to a serious risk of substantial harm without justification.

The Supreme Court has also held that, "in an obvious case," the clearly-established prong can be established "even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Prior caselaw is unnecessary where "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question." *Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). The Eighth Circuit has also held that qualified immunity can be denied even in the absence of factually analogous cases where an official "acts so far beyond the bounds of his official duties that the rationale underlying qualified immunity is inapplicable." *Irving*, 519 F.3d 441.

In the present case, Ms. Buckley's complaint alleges that she was injected with a powerful and dangerous sedative after she was already fully restrained on a gurney, after she had become semi-conscious, and even though she was not offering any physical resistance or obstruction. The complaint further alleges that the Defendant paramedics fabricated justification to sedate her and injected her with ketamine for the sole purpose of enrolling her into their ketamine study without consent. Based on these facts, the Defendants knowingly and intentionally subjected Ms. Buckley to a substantial risk of

serious harm without any justification, which constitutes an obvious violation of Ms. Buckley's constitutional right to remain free from such health risks and conditions of confinement. For all of these reasons, the Defendant paramedics are not entitled to qualified immunity on Ms. Buckley's Fourteenth Amendment deliberate indifference claim (Count 2).


## IV. PLAINTIFF'S COMPLAINT (COUNTS 1 AND 2) SUFFICIENTLY STATES CONSTITUTIONAL VIOLATIONS AGAINST DEFENDANTS HEEGARD, COLE, HO, NYSTROM, PEINE, AND HEIM-DUTHOY UNDER THE THEORY OF CONSTITUTIONAL SUPERVISORY LIABILITY.

"In the section 1983 context, supervisor liability is limited. A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." *Boyd v. Knox*, 47 F.3d 996, 968 (8th Cir. 1995). A supervisor can be held liable under section 1983 "when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference towards the violation." *Id.* "'The supervisor must know about the conduct and facilitated it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see.'" *Id.* (quoting *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994)).

In the present case, Plaintiff's Complaint, read as a whole, sufficiently establishes that Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy violated Plaintiff's clearly established constitutional rights as set forth in Sections I-III above. Specifically, the Complaint alleges that Defendants Heegard, Cole, Ho, Nystrom, Peine,

and Heim-Duthoy were in charge of the ketamine studies and were personally involved in designing, implementing, and overseeing the ketamine research at issue in this case.

The Complaint alleges that Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy designed both the first and second study, developed an unlawful scheme to waive informed consent, removed all sedatives except ketamine from the Hennepin County ambulances during certain portions of the study, and then directed Hennepin County paramedics to inject even mildly agitated patients with ketamine. The Complaint further establishes that Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy personally knew about the significant health risks associated with use of ketamine, including the 40-50% chance of developing serious respiratory complications requiring intubation. Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy directed Hennepin County paramedics to terminate the use of haloperidol, a much safer and commonly used sedative, and to instead sedate all patients during certain periods of the study with ketamine. Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy knew that a significant number of patients, such as Ms. Buckley, would develop respiratory failure as a direct result of their experimentation with ketamine, but they disregarded this risk and subjected numerous patients to serious risk of harm without consent all for the purpose of unnecessary and inherently dangerous medical research.

The facts summarized above, and as set forth in more detail in Plaintiff's Complaint and Statement of Facts above, sufficiently establish that Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy are liable to Ms. Buckley under the theory of supervisory liability. The facts recited above establish that, even though Defendants

Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy did not physically restrain or inject Ms. Buckley, they were nonetheless personally involved because they "facilitated . . . , approved . . ., [and] condoned" the ketamine studies that caused Ms. Buckley to be injected. *See Boyd*, 47 F.3d at 968. In addition, Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy "turned a blind eye" and engaged in deliberate indifference to Ms. Buckley's constitutional rights when they intentionally implemented a ketamine policy that they knew would result in unnecessary respiratory failure of numerous patients. *See id.* For all of these reasons, Defendants Heegard, Cole, Ho, Nystrom, Peine, and Heim-Duthoy are individually liable to Ms. Buckley under Counts 1 and 2 of the Complaint under the theory of constitutional supervisory liability.

## V.      PLAINTIFF'S COMPLAINT (COUNT 3) SUFFICIENTLY STATES A *MONELL* CLAIM AGAINST THE MUNICIPAL DEFENDANTS.

"A municipality that operates under a policy or custom that unconstitutionally deprives a citizen of his or her rights may be liable under § 1983. This is true even if the . . . [individual defendants] are not held responsible because of some good faith belief, meriting qualified immunity." *Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 813 (8th Cir. 1994) (citations omitted). "A municipality may not assert qualified immunity as a defense." *Id.*

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy.'" *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Monell v.*

*Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978)). "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). In *Pembaur v. City of Cincinnati*, the Supreme Court held that a municipality could be held liable for a "policy" that consisted of a single decision by municipal policymakers. 475 U.S. 469, 480 (1986). In that context, the Court defined "policy" as a "deliberate choice to follow a course of action . . . from among various alternatives." *Id.* at 483. "[A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy . . . ." *Mettler*, 165 F.3d at 1204. "For a municipality to be liable, a plaintiff must prove that a municipal policy or custom was the 'moving force [behind] the constitutional violation.'" *Id.* (quoting *Monell*, 436 U.S. at 694).

Turning to the present case, Plaintiff's Complaint sufficiently pleads a *Monell* claim against the municipal Defendants and the individual Defendants sued in their official capacities. As an initial matter, for all of the reasons set forth in Sections I-IV above, Ms. Buckley's Complaint sufficiently establishes that the individual Defendants violated her Fourteenth Amendment rights. Specifically, the Complaint sufficiently pleads three distinct Fourteenth Amendment violations: (1) excessive force (Count 1), discussed in Section I, *supra*; (2) violation of bodily integrity (Count 2), discussed in Section II, *supra*; and (3) deliberate indifference to substantial risk of harm (Count 3), discussed in Section III, *supra*. Thus, notwithstanding the possible application of qualified immunity, Plaintiff's complaint sufficiently establishes that she had suffered a

constitutional violation for the purposes of establishing *Monell* liability. *See Tilson*, 28 F.3d at 813 ("A municipality may not assert qualified immunity as a defense.").

Having established that Plaintiff suffered constitutional violations, the only remaining issue is whether Plaintiff's constitutional rights "were violated by an action pursuant to official municipal policy," *Ware*, 150 F.3d at 880, and whether the Defendants' policy was the "moving force" behind the constitutional violations, *Mettler*, 165 F.3d at 1204. Plaintiff's Complaint easily satisfies this element as well. As explained in the Complaint, in 2012, Defendants reported that the County's official sedation protocol allowed for ketamine to be used only in extreme cases involving excited delirium where the subject presented a physical danger to him/herself or others and was engaged in violent and combative behavior. (Compl. ¶22.) Specifically, in 2012, Defendants reported that Hennepin County's "standing-order protocol reserves the use of ketamine for profound agitation involving the imminent risk of injury to the patient or provider . . . ." (Compl. ¶22; Compl, Ex. 5, p. 277.) As Defendants themselves reported, ketamine could be used only on patients "with active physical violence." (Compl., Ex. 5, p. 277, Fig. 1.) Defendants themselves "advocate[d] that ketamine not be the chemical solution for every unruly or belligerent subject[], as this would lead to overuse with unnecessary risk." (Compl. ¶22, Compl., Ex. 5, p. 277.)

At some point between 2012 and 2017, Defendants abandoned their prior protocol and commenced their research studies where the ketamine protocol was modified depending on the time period in the study. Contrary to the prior protocol which prohibited the use of ketamine except in cases involving physical violence, the new

protocol required the use of ketamine on patients scoring +2 on the AMS scales, which is defined as exhibiting "loud outbursts" with no physical violence or aggression. (Compl., ¶18.)

In December of 2017, Defendants were conducting their second study, "Ketamine versus Midazolam for Prehospital Agitation," which was scheduled to run from August 1, 2017, to August 31, 2018. (Compl., Ex. 1, p. 1-2.) According to Defendants' federal submissions, "The first 6 month period of the study will employ a ketamine-based protocol for prehospital agitation." (Compl., Ex. 1, p. 2.) "For severely agitated patients, intramuscular ketamine . . . will be administered first line." (Compl., Ex. 1, p. 2.) The "Inclusion Criteria" for this study defined "Severe agitation" as "AMSS [score of] +2 or +3." In the first study, Defendants reported that, during the ketamine period, "haloperidol was removed from all ambulances in the system." (Compl., Ex. 2, p. 557.) Discovery has not been completed at this point; however, based on the information currently available, discovery is likely to confirm that, during the second study, "Defendants [also] removed all other sedatives from their ambulances," just as alleged in the Complaint. (Compl. ¶57.) *See Twombly*, 550 U.S. at 556 (2007) (to survive a motion to dismiss under Rule 12, the complaint need only allege sufficient facts to raise a reasonable expectation that discovery will reveal evidence of illegal conduct). Finally, prior to commencing the second study, Defendants knew, from their own research, that approximately 39% of patients receiving ketamine would develop significant complications and would require intubation. (Compl. ¶19.)

As these facts show, in August of 2017, Defendants developed and implemented a policy requiring all patients scoring +2 or above on the AMS scale to be sedated with ketamine during the first 6 month of the study. Defendants knew that the patients to be sedated would include patients, such as Plaintiff, who would not exhibit any physical violence or aggression. Defendants also knew, from their prior research, that approximately 39% of patients sedated with ketamine would develop significant complications, including respiratory failure, and would need to be intubated. Defendants also had access to haloperidol, a much safer sedative with significantly reduced complication rates, yet Defendants intentionally removed haloperidol from the ambulances during the ketamine study period.

Defendants made an intentional and conscious policy decision to require sedation of non-violent patients (such as Plaintiff) with a sedative that carried a 39% chance of causing respiratory failure, all while a much safer and equally effective sedative, haloperidol, was available but intentionally removed from the ambulances. Defendants' ketamine policy was unconstitutional because it subjected non-violent patients to unnecessary and substantial risk of serious physical harm and also resulted in excessive use of force and violations of patients' right to bodily integrity. Pursuant to this policy, the Defendant paramedics unnecessarily sedated Ms. Buckley with ketamine and, as a result, almost killed her. As these facts demonstrate, the municipal Defendants' ketamine policy was the "moving force" behind the violations of Ms. Buckley's constitutional rights. Accordingly, Defendants' motion to dismiss Ms. Buckley's *Monell* claim should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion for judgment on the pleadings be denied in its entirety.


THE LAW OFFICE OF ZORISLAV R. LEYDERMAN


Dated: <u>June 5, 2019</u>                    By: <u>s/ Zorislav R. Leyderman</u>
                                        ZORISLAV R. LEYDERMAN
                                        Attorney License No. 0391286
                                        Attorney for Plaintiff
                                        The Law Office of Zorislav R. Leyderman
                                        222 South 9th Street, Suite 1600
                                        Minneapolis, MN 55402
                                        Tel: (612) 876-6626
                                        Email: zrl@ZRLlaw.com